TRINA A. HIGGINS, United States Attorney (#7349)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
LUISA GOUGH, Assistant United States Attorney (#17221)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-CR-00039-HCN |
| Plaintiff, | UNITED STATES' CONSPIRACY PROFFER |
| vs. | |
| | District Judge Howard C. Nielson, Jr. |
| MASON WARR, | |
| Defendant. | |

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby submits its Conspiracy Proffer (Proffer) in response to Defendant Mason Warr's Motion for *James* Hearing and Memorandum in Support (Motion).[1] This Proffer begins by briefly discussing caselaw governing the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) and,

---

[1] Motion, *U.S. v. Bassett*, 2:23-cr-00039-HCN-JCB (D. Utah Mar. 15, 2024), ECF 50.

alternatively, other provisions of Rule 801. Next, the Proffer outlines the evidence before describing how it establishes the necessary elements for admission.

The government is not detailing all its evidence showing the existence of a conspiracy, nor is it describing every statement made in furtherance of the charged conspiracy. The Proffer does not list all the witnesses or evidence. It is not intended to be a full recitation of the government's evidence and witnesses for trial or a means of committing to presenting certain evidence and witnesses. Rather, this Proffer highlights the evidence necessary for the court to admit the coconspirator statements. In this manner, the government will establish that (1) a conspiracy existed, (2) Warr was part of the conspiracy, and (3) the statements the government seeks to admit were made in furtherance of the conspiracy and are therefore admissible as nonhearsay.

## RELEVANT PROCEDURAL HISTORY

In February 2023, a federal grand jury charged Warr and others in a 25-count Indictment, alleging violations of 18 U.S.C. § 371 (Conspiracy to Defraud the United States), 18 U.S.C. § 1343 (Wire Fraud), and 26 U.S.C. § 7206(2) (Aiding and Assisting in Filing False Tax Returns).[2] Due in part to the voluminous discovery, the parties continued the trial date four times to allow defense counsel time to review discovery

---

[2] Indictment, 2:23-cr-00039-HCN-JCB (D. Utah Feb. 1, 2023), ECF 1.

and prepare for trial.[3] A final trial date of September 10, 2024 was set during a status conference in March 2024.[4] Warr filed his Motion shortly thereafter, seeking a pretrial hearing to determine the admissibility of co-conspirator statements pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979).[5]

After full briefing on the Motion, the court held a status conference on the Motion.[6] The court reviewed the briefing before explaining its intention to provisionally determine the admissibility of coconspirator statements via pretrial proffer.[7] The court instructed the government to prepare a proffer establishing the existence of a conspiracy, outlining the scope and contours along with Warr's role in the conspiracy, and then describing how coconspirator statements fall within the contours of the conspiracy. The proffer must identify the subject matter of the statements to establish they were made in furtherance of the conspiracy but, according to the court, did not need to be a line-by-line description of every statement. This Proffer is intended to meet those requirements.

## LEGAL FRAMEWORK

Hearsay is an out of court statement offered to prove the truth of the matter

---

[3] *See* Orders to Continue, 2:23-cr-00039-HCN-JCB (D. Utah May 5, 2023; Aug. 10, 2023; Dec. 7, 2023; Mar. 15, 2024), ECF 39, 42, 45, 49.

[4] Minute Enry, 2:23-cr-00039-HCN-JCB (D. Utah Mar. 12, 2024), ECF 48.

[5] *See generally* Motion.

[6] Minute Entry, 2:23-cr-00039-HCN-JCB (D. Utah June 5, 2024), ECF 54.

[7] What follows is the government's understanding of the court's instructions.

asserted.[8] Although hearsay is not typically admissible at trial, the Federal Rules of

Evidence provide several exclusions and exceptions from this general ban.[9]

Nonhearsay statements are proper, and include: [1] statements offered against an

opposing party which were "made by the party in an individual or representative

capacity," (Rule 801(d)(2)(A)); [2] statements "made by the party's agent or employee

on a matter within the scope of that relationship and while it existed," (Rule

801(d)(2)(D)); and [3] statements "made by the party's coconspirator during and in

furtherance of the conspiracy," (Rule 801(d)(2)(E)).[10] Importantly, to qualify as hearsay,

a statement must be offered "to prove the truth of the matter asserted in the

statement."[11] If a statement "is not offered for its truth, the statement is not considered

'hearsay.'"[12]

　　　　To admit a coconspirator's out-of-court statements under Rule 801(d)(2)(E), a

"court must determine by a preponderance of the evidence that: (1) a conspiracy

existed, (2) the declarant and the defendant were both members of the conspiracy, and

---

[8] Fed. R. Evid. 801(c).

[9] *See id*. R. 802 ("Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."); *see also id*. R. 801 (outlining exclusions from hearsay); *id*. R. 803, 804, 807 (describing a number of exceptions to the rule against hearsay).

[10] Fed. R. Evid. 801(d)(2)(A), (D), (E).

[11] *Id*. R. 801(c)(2).

[12] *United States v. Brinson*, 772 F.3d 1314, 1322 (10th Cir. 2014).

(3) the statements were made in the course of and in furtherance of the conspiracy."[13] The elements of a conspiracy, in turn, are: (a) an agreement to violate the law; (b) "the declarant knew the essential objectives of the conspiracy"; (c) the declarant knowingly and voluntarily participated; and (d) "the coconspirators were independent."[14] "The existence of a conspiracy may be inferred from circumstantial evidence."[15]

When making a Rule 801(d)(2)(E) determination, it must be more likely than not that the foregoing is true.[16] Because this is a preliminary question about whether evidence is admissible, the rules of evidence, other those governing privilege, are inapplicable.[17] And "[t]he court may consider both independent evidence and the statements themselves" to make its findings.[18] Some independent evidence beyond the coconspirator statements is required to link the defendant to the conspiracy, but it "need not be substantial."[19]

Courts have discretion in making pretrial determinations on the admissibility of coconspirator evidence.[20] In the Tenth Circuit, it is preferable for the court to utilize a

---

[13] *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017).

[14] *United States v. Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013).

[15] *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987).

[16] *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

[17] *Id.* at 177–78 (quoting Fed. R. Evid. 104).

[18] *Rutland*, 705 F.3d at 1248.

[19] *Alcorta*, 853 F.3d at 1142.

[20] *Roberts*, 14 F.3d at 514.

*James* hearing to satisfy the prerequisites for admission of a coconspirator statement.[21]

A court may, however, "provisionally admit the evidence with the caveat that the

evidence" connects up at trial.[22] The proper approach depends on "the particular

configuration of the government's evidence and the constraints of a multi-defendant

trial."[23]

### FACTUAL PROFFER[24]

<u>Background</u>

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic

Security Act (CARES Act). The CARES Act included an employee retention tax credit

(ERC) designed to encourage businesses to keep employees on their payroll during the

COVID-19 pandemic. The ERC was a refundable tax credit against certain employment

taxes equal to 50% of the qualified wages an eligible employer paid to employees after

March 12, 2020, and before January 1, 2021. This was later extended to include the first

three quarters of 2021, and the payout increased to 70% of qualified wages for eligible

employers.

For each employee, up to $10,000 per quarter could be counted toward ERC

---

[21] *Id.* at 1138 (citing 590 F.2d 575).
[22] *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).
[23] *Roberts*, 14 F.3d at 514.
[24] Prior to delving into the conspiracy itself, a brief factual background of the relevant tax programs is provided to give context and aid in understanding of the conspiracy.

payouts. Between March 13, 2020, and December 31, 2020, ERC payouts were capped at $5,000 per employee, per quarter. From January 1, 2021, to September 30, 2021, ERC payouts were capped at $7,000 per employee, per quarter.

ERC payouts could be obtained by filing either an IRS Form 7200 (Advance Payment of Employer Credits Due to COVID-19) or Form 941 (Employer's Quarterly Federal Tax Return) and therein requesting a reduction in upcoming payroll tax deposits or a direct refund payment to the employer. The COVID-related tax credits could be greater than the tax owed by the employer, resulting in a refund to the employer.

Form 7200 required the filer to enter the amount of total qualified sick leave and family leave wages "eligible for credit and *paid* this quarter." Form 941 required the filer to list the number of employees "who received wages, tips, or other compensation for the pay period."

Additionally, Congress provided other COVID-related tax benefits for employers through the Families First Coronavirus Response Act (FFCRA). FFCRA required certain employers to give employees up to 80 hours of paid sick leave and expanded the amount of family and medical leave to 10 weeks for reasons related to COVID-19. Similar to ERC, FFCRA awarded refundable tax credits as reimbursement for employers who paid sick and family leave wages to employees for leave related to

7

COVID-19.

Self-employed individuals were not eligible for these two COVID-related tax

credits.

<u>Scope/Contours of the Conspiracy</u>

The facts proffered below establish that Mason Warr, Zachary Bassett, and Grant

Walker jointly agreed to prepare and file with the IRS fraudulent tax forms.

Specifically, they filed Forms 941 and 7200 that purported to be signed by the client and

the paid tax preparer, but were neither reviewed nor signed by either.  The forms

presented false information about each reporting period, including false information

about the number of employees on payroll, the amount of of the eligible employee

retention credit (which is based on actual wages paid to those employees), the amount

of sick wages paid to those employees, and the amount of family medical leave paid for

those employees.

1. COS Accounting is a Utah-based limited liability company with an incorporation
   date of August 2019. (Information publicly available from the Utah Department of
   State) Warr is the co-founder and Chief Executive Office. Bassett is also a co-
   founder, the Chief Financial Officer, and Senior Tax Manager. (Mem. Of Oct. 20,
   2020 Interview of Zachary Bassett.[25]) Bassett previously worked at JB Accounting &
   Tax, LC as a Partner. (*Id*.) Bassett has a Bachelor's degree in Accounting and a
   Master's degree in Taxation. (*Id*.)

---

[25] (Each of the individuals whose interview information is relied upon below, except the Defendants, is
expected to testify to these facts at trial.  The Defendants' interview statements will be introduced by one
of the interviewing agents).

2.  COS Accounting catered almost exclusively to young individuals who were self-employed through industries such as door-to-door sales. (Mem. Of Oct. 20, 2020 Interview of Zachary Bassett.) Its original business model was to push for these individuals to set up an LLC for themselves as a means to avoid self-employment tax. Rather than claim the income personally, the individuals would claim their income through the LLC and pay themselves wages as an employee of the LLC.

3.  In March 2020, Warr and Bassett hired Grant Walker as an intern for COS Accounting. (Mem. Of Oct. 20, 2020 Interview of Grant Walker.) Walker had not finished college. He had no accounting experience and was hired for clerical work—printing and filing documents. (*Id.*)

4.  Bassett was an authorized paid tax preparer.  He directed Walker to use his stamp to prepare forms for COS's clients, and to sign on behalf of the clients as well. (Mem. Of May 11, 2021 Interview of Grant Walker.)  This was originally the purpose of hiring Walker.  (*Id.*)

5.  Walker will testify that, at that time, COS Accounting was a small office. It had approximately 6–7 employees with one location that had an estimated 800 square feet of space.

6.  Walker watched Bassett give a presentation about EIDL, a COVID relief program. Walker, Bassett, and Warr began discussing the PPP and EIDL programs.  (Mem. Of May 11, 2021 Interview of Grant Walker.)  Walker discovered a Form 7200 online, and began researching making sick and family leave claims on the forms. He was still working with Warr, but began talking with Bassett more, on a daily basis.  He would print articles while at home and bring them to work to ask Bassett and Warr how they worked.  (*Id.*)

7.  Walker will testify that he filed Forms 7200 and 941 following the same process as previously instructed by Bassett.  That is, to sign for Bassett and for the clients.

8.  To promote the ERC offering to COS Accounting's target clients, Warr helped Walker produce videos promoting the ERC.  The videos were Bassett's idea.  Warr wrote the scripts for the videos and set up the camera in his office.  Walker was the one who appeared on the videos.  (Mem. Of May 11, 2021 Interview of Grant Walker.)

9.  Warr relied upon information from the Department of Labor and IRS websites and would show these to Bassett and Warr.  Bassett would tell them they could just "max it out" and it doesn't seem like a big deal to "bump it up."  (*Id.*)

10. On April 15, 2020, Bassett's brother, another tax preparer, sent Bassett an email stating that what he was doing was not permissible.  (*Id.*)

11. Walker became concerned about what they were doing.  He contacted an attorney, Mark Kohler, who told Walker that bumping up the reimbursement claims seemed like a problem.  Walker relayed this information to Warr.  (*Id.*)

12. Walker also discussed with Bassett whether there were problems with what they were doing.  Bassett indicated that the numbers were low-dollars that would not be noticed by the IRS.  He told Bassett that we are in the business of pushing back against the IRS until they tell us otherwise; the IRS doesn't care about $20k.  (*Id.*; Text message between Bassett and Walker.)

13. Under the direction of Bassett, Warr, and Walker, COS Accounting continued to file ERC reimbursement claims, and claims for reimbursement for family leave and sick leave that were not based upon actual wages, sick leave, or family leave paid.  They reduced the amount of family leave and sick leave payment claims so that they were not claiming the maximum amount.  But they continued to make reimbursement claims that were not based upon actual amounts paid.  (Mem. Of May 11, 2021 Interview of Grant Walker; Anticipated testimony of Tyler Haws and Todd Naylor)

14. When client calls came into Warr and Bassett, they would direct the clients to Walker to discuss the ERC.  (Mem. Of May 11, 2021 Interview of Grant Walker.)

15. Walker developed a call script based upon directions provided by Bassett.  Warr and Bassett hired additional employees to help field client calls and convince them to apply for reimbursements of ERC, family leave, and sick leave.  The call script did not ask for information about actual wages, family leave, or sick leave paid.  It asked the clients simply whether they were single or married.  COS personnel were directed to make a maximum ERC claim for both client and their spouse, regardless of the amount the client was paid and regardless of whether the spouse was paid

any qualified wages at all.  (Mem. Of May 11, 2021 Interview of Grant Walker; anticipated testimony of Tyler Haws)

16. Walker will testify that COS Accounting created a chart to determine what "wages" should be claimed by the businesses to the business owner. A business would pay $10,000 in wages in order to receive the $5,000 tax credit (max amount). Walker and Tyler Haws (another COS employee) will testify that, in reality, no wages were being paid and COS made no inquiry whether wages were being paid.  The wages were a construct Bassett invented.

17. Walker and Todd Naylor will testify that Warr justified the idea of including spouses as employees for ERC purposes by asserting the spouse could be an employee by being there and possibly doing things like scratch the individual's back or making dinner. Warr's thought was that the IRS couldn't say the spouse was not an employee: the IRS would not know, it would not find out, it would not push back. Bassett expressed the same sentiments.

18. Walker and Tyler Haws will testify that Bassett trained COS Accounting employees to claim a spouse as an employee of an LLC, even if the client said they spouse was not an employee of the business. Bassett's explanation was that most spouses automatically qualify because they provide support such as mental and moral support. Warr talked about this being a "gray area" that the IRS could not say no to.  Warr's discussion is reflected in an undercover recording that will be presented at trial.

19. Walker will testify that Warr and Bassett also instructed him to file ERC, family leave, and sick leave claims on behalf of themselves and their families, and to maximize the mount they got in return.  *Apr. 7, 2020 Email from Zachary Bassett to Grant Walker* ("Please get the tax credit thing rolling for me and my wife. I have one son if that helps. I will give you $500 if I get at least $10,000. As far as the prior email for Jaron, he would pay to have it done and also give you $500 if he gets at least $10,000.")  Warr confirmed in an undercover recording that he had done so.

20. Walker will testify that Warr and Bassett sent him to travel the country to drum up customers to file reimbursement claims for the ERC, family medical leave, and sick leave.  Warr and Bassett hired someone new to manage the "ERC" program while

Walker was away doing sales.

21. Bassett determined the fee that clients would be charged.  It was approximately 10% of the ERC, family leave, and sick reimbursements claimed for the client. Bassett and Warr promised Walker that he would be paid a commission on the claims made on the Forms 7200 and 941.  (Mem. Of May 11, 2021 Interview of Grant Walker.)

22. Between approximately April 8, 2020 and October 20, 2020, COS Accounting submitted at least 953 Forms 7200 to the IRS, claiming a total of around $4.8 million in ERC and sick and family leave credits for its clients. COS Accounting's business model charged per COVID-related tax credit filing and based on the status of the filer. There was a baseline fee for single clients, with increases for married clients and married clients with family leave. This fee schedule was based on the amount of credit the clients would receive. (IRS Forms; Anticipated Employee Tyler Haws Testimony; Recording of Undercover Call with Tyler Haws.)

23. By early April 2020, the COVID department at COS Accounting exploded. Dozens of employees came on and the focus of the department was sales, not taxes. The employees were encouraged to sell as many people as possible on the COVID-related tax credits. Warr and Bassett were both pushing for those sales. (These facts have been reported by Grant Walker and Employees Tyler Haws and Adam Erickson, all of whom are expected to testify).

24. Bassett and Warr provided training for COS Accounting employees. Later, when other supervisors came on, they too were trained by Bassett and Warr. Bassett directly trained COS Accounting employees how to claim a spouse as an employee. All employee questions were directed to Warr. (Tyler Haws Anticipated Testimony).

25. These employees were trained to ask potential clients basic questions to determine if they were eligible for COVID-related tax credits and provided a script to use with the questions typed out. First, to determine eligibility for ERC they would ask: Are you working this year? Do you have some sort of impact from COVID? The understanding was that basically everyone could say they were impacted. In fact, the script says, "They will all qualify." The employees were also trained to ask: Are you married? Do you have kids? The instruction given was that married clients

12

could claim their spouse as a business employee and clients with kids could claim additional family leave credit. (Anticipated testimony of COS Employees Tyler Haws and Adam Ericksen; Copy of COS Employee ERC Script.)

26. As to wages, employees were trained to understood there was no need for wages to be paid with a check; wages could just be claimed if the customer anticipated income in the range of $10,000. Anticipated Testimony of COS Employees Tyler Haws and Todd Naylor; Recording of Undercover Conversation with Zachary Bassett; Email Between customer Mason Porter and COS Accounting).

27. COS Accounting employees were trained to calculate sick and family medical leave based on marital status and the number of children, not on whether leave was taken and paid out. (Anticipated Testimony of COS Employees Tyler Haws and Adam Ericksen.)

28. To incentivize sales, Warr and Bassett offered commissions based on higher claims for tax credits. The push was to bring on client regardless of who and what the circumstances, seeking to maximize the COVID-related tax credits as much as possible. (Anticipated Testimony of COS Employees Grant Walker.)

29. Warr hired Todd Naylor in late April/early May to replace Walker while he was doing summer sales. Mr. Naylor reported to Warr, who then reported to Bassett. Mr. Naylor was involved in training new employees. Similar to Bassett and Warr, Mr. Naylor trained employees to ask about marital status and children in order to increase ERC claims and family leave credit. Warr mainly trained Mr. Naylor on what to instruct employees. (Anticipated Testimony of COS Employees Grant Walker, Tyler Haws, and Todd Naylor.)

30. When Walker returned in fall 2020, COS Accounting had expanded significantly. It had at least two locations with dozens of employees, 80% had been hired over the summer while Walker was gone. The vast majority of COS Accounting's revenue came from filing COVID-related tax credits. (Anticipated Testimony of COS Employees Grant Walker and Todd Naylor.)

## ANALYSIS

Based on the foregoing Proffer, the court should conditionally admit the

coconspirator statements for trial. The government's evidence shows it is more likely than not that (1) a conspiracy existed, (2) the coconspirator declarants and Warr were members of the conspiracy, and (3) the coconspirator statements were made in furtherance of the conspiracy.

1.  **Warr, Walker, and Bassett Were Members of a Conspiracy to Submit False and Fraudulent Documents**

As noted, a conspiracy is established by demonstrating (a) there was an agreement to violate the law, (b) the coconspirator declarants knew the objectives of the conspiracy, (c) the coconspirator declarants knowingly and voluntarily participated in the conspiracy, and (d) the coconspirators were interdependent. Circumstantial evidence may be used to create an inference that a conspiracy exists. Here, there is sufficient evidence to establish the existence of a conspiracy.

a.  Warr, Bassett, and Walker agreed to violate the law.

There need not be an express or formal agreement to establish a conspiracy; just evidence showing "the coconspirators tacitly came to a mutual understanding."[26] Direct and circumstantial evidence show Warr agreed with Bassett and Walker to violate the law.

Walker reported  he had many meetings and discussions with Warr and Bassett to

---

[26] *Rutland*, 705 F.3d at 1250 (internal quotation marks and citation omitted).

establish COS Accounting's strategy for maximizing clients' claims of reimbursement for ERC, family leave, and sick leave. The formulas they agreed upon did not rely upon actual amounts paid, but instead sought reimbursement for fictitious, fabricated amounts. As set forth in the factual proffer above, Warr participated with Bassett and Walker in developing this scheme, creating promotional videos to perpetuate the scheme, training employees on how to implement the scheme, persuading clients the scheme was legitimate, and hiring employees to grow the scheme. The scheme was against the law because it relied upon false and fictitious statements and depended upon the filing of false and fraudulent documents.

    b. <u>Warr, Bassett and Walker knew the objectives of the conspiracy.</u>

To prove knowledge of the essential objectives merely requires demonstrating "the defendant shared a common purpose or design with his alleged coconspirators," not that the defendant "knew all the details or all the members of the conspiracy."[27] The essential objective of the scheme was to make money by filing false and fraudulent reimbursement claims for clients. Warr understood that. Witnesses will testify that the ERC program was the primary driver of the explosive growth his business in 2020. Warr helped develop programs to incentivize employees to recruit clients into the ERC program. Warr also helped recruit clients by participating in podcasts.

---

[27] *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (internal quotations marks omitted).

c.  <u>Warr, Bassett and Walker knowingly participated in the conspiracy.</u>

As described above, Warr, Bassett, and Walker each knowingly participated in the conspiracy.  They each had roles in the business, whose primary operations were the promotion of the ERC program they knew to be fraudulent.  Warr trained and hired employees.  He promoted the ERC program to clients.  He helped create promotional videos for the ERC program.  He encouraged employees to record spouses as employees, regardless of whether they received any wages and regardless of whether they performed any actual work.  Bassett also provided trainings and developed formulas to provide to employees to take the credit.  He loaned legitimacy to the enterprise by authorizing employees to use his signature stamp to sign returns that he never looked at or reviewed and directing employees to sign on behalf of clients.  Walker went around the country to recruit new clients for the ERC program, fielded customer calls about the ERC program, trained employees on how to implement the program.

d.  <u>Warr, Bassett, and Walker were interdependent.</u>

Interdependence is present if the coconspirators were united in a common goal or purpose, that is, if their actions benefited each other or the success of the venture.[28]

Warr, Bassett, and Walker each contributed in different ways to increase the COVID-related tax filings and clientele, thereby increasing their bottom line. As co-

---

[28] *Rutland*, 705 F.3d at 1250.

founders in the company, any money the company made was a direct benefit to them. Because the company profited from more filings and filings that received higher tax credits, pushing employees to file more and bump up credits necessarily benefitted them. As outlined above, Bassett and Warr each took steps to do just that. They each made different videos intended for separate audiences to boost clientele. Their roles within the company were different. Bassett's name was on all the filings. Warr answered employee questions. Together they managed the operations of COS Accounting to keep filings up.

Walker received commissions on "anything"—summer sales, filling forms, bringing on new clients. He increased filings through the form filler system. He sought more clients through summer sales.

**2.** <u>**Anticipated Categories of Coconspirator Statements in Furtherance of the Conspiracy**</u>

The United States anticipates introducing the following categories of coconspirator statements

1. Statements of Walker to COS Employees about Reimbursements for ERC, Family Leave, and Medical Leave
2. Statements of Bassett to COS Employees ERC, Family Leave, and Medical Leave
3. Statements of Walker to COS Clients ERC, Family Leave, and Medical Leave
4. Statements of Bassett to Walker and Other COS Employees about IRS Scrutiny and Desire to Push Boundaries

5.  Statements of Bassett to Walker and Other COS Employees About Whether or Not to Change Operations following IRS Visit

Each of these categories clearly involves statements by a member of the conspiracy –Walker or Bassett—in furtherance of the conspiracy.  The statements will be reflected in emails and texts and testimony of oral conversations.  Trainings and incentives provided to employees for enrolling clients in the ERC program are clearly in furtherance of the conspiracy to earn commissions by enrolling clients in the ERC program.  Bassett's statements to Walker and Other COS Employees about IRS Scrutiny, his desire to push boundaries, and whether or not to change operations following the IRS visit were all for the purpose of encouraging continued participation in the ERC scheme, defusing concerns by Walker and other employees, and strategies for avoiding further IRS scrutiny or suspicion.  (E.g., he made statements that they should call up employees to check whether they did qualify, and then stated they shouldn't because that might make them appear guilty).  Such statements are clearly made in furtherance of the conspiracy, because they are intended to promote the conspiratorial objectives.  *See United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir.2007) (internal quotation omitted).[29]

---

[29] The Tenth Circuit has observed:

We have found the following sorts of statements to be in furtherance of a conspiracy: (1) statements explaining events of importance to the conspiracy, *id.*; (2) "statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy," *United States v. Smith*, 833 F.2d 213, 219 (10th Cir.1987) (internal quotation omitted); (3) statements identifying a fellow coconspirator, *Townley*, 472 F.3d at 1273; and (4) discussions of future intent "that set transactions to the

For the foregoing reasons, the United States respectfully submits that the Court should make a preliminary ruling that the United States has shown, by a preponderance of evidence, the existence of a conspiracy between Warr, Walker, and Bassett, and that the categories of statements identified above are in furtherance of the conspiracy for purposes of F.R.E. 801(d)(2)(E).[30]

DATED this 6th day of August, 2024.

Respectfully submitted,

TRINA A. HIGGINS
United States Attorney

By: /s/ Carl D. LeSueur
Carl D. LeSueur
Luisa Gough
Assistant United States Attorneys

---

conspiracy in motion" or that maintain the flow of information among conspiracy members, *United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir.1995). Mere "narrative declarations of past events," however, are not in furtherance. *Gutierrez*, 48 F.3d at 1137.

*United States v. Rutland*, 705 F.3d 1238, 1252 (10th Cir. 2013)

[30] The United States reserves the right to present its preliminary theories of admissibility, which are that the statements are not hearsay at all, because they reflect verbal acts, do not reflect assertions of fact, and are not being submitted for truth of the matter asserted. Indeed, in many instances, the statements are submitted to show the absurdity of the justifications used to lull COS's employees and clients into continuing the scheme and the fact that both Warr and Bassett's participation in those efforts.